ANDINA COFFEE, INC., Plaintiff, v NATIONAL WESTMINSTER BANK USA, Appellant, and BANCO CREDITO Y COMMERCIO, Respondent, et al., Defendant.

ANDINA COFFEE, INC., Plaintiff, v COOPERATIEVE CENTRALE RAIFFEISENBOERENLEENBANK B. A., "RABOBANK NEDERLAND", NEW YORK BRANCH, Appellant, and BANCO CREDITO Y COMMERCIO, Respondent, et al., Defendants.

First Department, August 9, 1990

### APPEARANCES OF COUNSEL

*Edward N. Meyer* of counsel *(Anthony J. D'Auria* and *Robert S. Fischler* with him on the brief; *Winston & Strawn,* attorneys), for appellants.

*Dorothea W. Regal* of counsel *(Thomas J. O'Sullivan* and *A. Grant McCrea,* with her on the brief; *White & Case,* attorneys), for respondent.

### OPINION OF THE COURT

MILONAS J.

Plaintiff Andina Coffee, Inc., a New York corporation, was engaged in the importation of coffee from defendant Gonchecol, Ltda., at one time a major Columbian exporter of coffee. To pay for its purchases, Andina delivered to Gonchecol letters of credit which it obtained from a number of commercial banks in New York, including defendants National Westminster Bank USA (NatWest) and Cooperatieve Centrale Raiffeisenboerenleenbank B.A. (Rabobank). As the beneficiary of

the letters of credit, Gonchecol apparently used all or some of the funds to borrow money from defendant Banco Credito y Commercio de Columbia (BCCC) and other Colombian banks in order to finance its business operations. In June 1986, BCCC advanced $2,100,000 to Gonchecol in exchange for which it was to be reimbursed through a $2,100,000 check drawn on a Panamanian bank. However, Gonchecol's check bounced, and BCCC was left with an unpaid $2,100,000 loan. According to NatWest and Rabobank, this event could only have served to confirm what BCCC had already learned from its own sources; that is, that Gonchecol had already lost millions of dollars and was experiencing severe financial difficulties. As was the situation with most of the moneys made available by BCCC to Gonchecol, the source of repayment would have to be proceeds from the letters of credit provided to Gonchecol from the issuing banks.

Beginning in May of 1986, coffee financed under the various letters of credit, which were to be paid on the presentation of interior truck bills of lading, failed to materialize. Consequently, representatives of the New York banks were dispatched to Colombia in August of 1986 when it was discovered that Gonchecol had caused fraudulent truck bills of lading to be furnished for large quantities of coffee which were, in fact, never shipped, thereby resulting in substantial financial losses to New York banks. The four letters of credit involved here are the last outstanding instruments which were not drawn against prior to the disclosure of the exporter's dishonest practices. In that regard, NatWest and Rabobank had each supplied two of the letters of credit, one for $2,104,000 and the other three in the amount of $1,000,000, pursuant to which they agreed to make payment upon the presentation within a specified period of time of drafts and certain documents, among which were to be the "original railroad and/or truck bill of lading". The bill of lading was supposed to show that the coffee was actually in existence, that it had left the control of the growers and that it was in the hands of the shipper and en route from the interior of Colombia to a seaport.

On July 9, 1986, 15 days after BCCC had already advanced $2,100,000 to Gonchecol against the latter's bad check, it received from NatWest a letter of credit in the amount of $2,104,000. The following day, almost six weeks before the earliest possible date for presentment under that instrument, BCCC accepted from Gonchecol its draft and accompanying

documents. These documents included truck bills of lading which were dated August 22, 1986, almost six weeks after the date submitted to BCCC, and purported to show that 8,000 bags of coffee had been delivered to a trucking company for transport to a Colombian port. BCCC sent the draft and documents to NatWest with a cover letter dated July 15, 1986. By telex dated July 22, 1986, NatWest advised BCCC that it would not pay under the letter of credit because of four enumerated discrepancies in the documents, including the fact that the draft and documents were presented prior to the earliest date mentioned in the letter of credit and that the truck bills of lading were postdated.

BCCC thereupon requested that the bills of lading and other documents be returned to it by mail. It then reviewed the documents received under the other three letters of credit and perceived that the bills of lading in those instances were similarly postdated. Consequently, it sent all of the bills of lading back to Gonchecol so that the exporter could revise the dates to comply with the letters of credit. Indeed, some of the changes were made twice in an attempt to bring the documents into conformity with both the form and date mandates of the letters of credit. Thus, it appears that the documents were designed more to effect payment under the letters of credit than to reflect accurately the business transactions that they were intended to evince. In any event, by the time that the documents had been altered and realtered, the full extent of Gonchecol's fraud had been detected, and payment was rejected by NatWest and Rabobank on the ground that, in part, the bills of lading were postdated and fraudulent.

The instant appeal concerns respective motions and cross motions for summary judgment with respect to the letters of credit. The Supreme Court, in granting BCCC's cross motion for summary judgment and denying the motions of NatWest and Rabobank for the same relief, was persuaded that BCCC took the drafts for value, in good faith and without any knowledge of any fraud defenses and was, therefore, a holder in due course entitled to payment under the letters of credit. In the view of the court, there is no evidence to support the assertions by NatWest and Rabobank that BCCC possessed actual knowledge of Gonchecol's fraud and that it did not accept the drafts in good faith. Finally, the court concluded that the "transactions involved in this case must be considered against a background of haphazard permissive and careless negotiations and payment of prior letters of credit by the

issuing banks over a year and a half period. First of all, it is not denied that the same discrepancies alleged in the documents submitted by BCCC were the same one *[sic]* which the banks had accepted for the aforementioned period * * *. Secondly, it cannot be denied that the letters of credit involved are not based upon underlying arms-length transactions." The court proceeded to criticize the issuing banks for assuming a high risk by merely demanding trucking bills of lading rather than on-board bills of lading, since it "appears that the port forwarder and the trucking company were all part of Gonchecol's enterprises and that the importer, Andina Coffee, Inc., although a separate corporate entity, belonged to the same overall organization as the exporter."

Yet, notwithstanding the questionable nature of the financing arrangement undertaken by NatWest and Rabobank, and, certainly, the record is replete with indications of dubious business judgment by the various issuing banks, the soundness of the lenders' financial practices is not at issue here. What is crucial is whether BCCC accepted drafts drawn upon letters of credit "under circumstances which would make it a holder in due course" (Uniform Commercial Code § 5-114 [2] [a]). As this court observed in *Barclay Knitwear Co. v King'swear Enters.* (141 AD2d 241, 245, *lv denied* 74 NY2d 605): "Section 5-114 (2) (a) of the Uniform Commercial Code provides that 'when documents appear on their face to comply with the terms of a credit but a required document * * * is forged or fraudulent or there is fraud in the transaction * * * the issuer must honor the draft or demand for payment if honor is demanded by a negotiating bank * * * which has taken the draft or demand under the credit and under circumstances which would make it a holder in due course'. Finally, it should be noted, disputes involving letters of credit 'are well suited to determination by motion for summary judgment because they normally present solely legal issues relating to an exchange of documents.' *(Banque Worms v Banque Commerciale Privee,* 679 F Supp 1173, 1178.)"

In *Barclay Knitwear Co. v King'swear Enters. (supra),* relied upon by BCCC, the court found in a commercial transaction financed by a letter of credit, that the documents submitted with the draft strictly complied with the terms of the letter of credit; that, moreover, the fraud which had been committed was by an agent of the party procuring the instrument and that there was no proof that the negotiating bank therein,

Bank of Communications (BOC), had knowledge of the fraud. Therefore, the court concluded (at 249-250):

"Notwithstanding this uncontradicted evidence, Barclay asserts that its allegations of fraud cast a shadow over BOC's status as a holder in due course. Since proving a negative, i.e., lack of notice of the alleged fraud, is concededly difficult, if not impossible, BOC's status as a holder in due course is beyond dispute, absent some direct evidence that it had notice of the alleged fraud. The reliability of commercial letters of credit as a medium of payment in international commerce would be seriously eroded if one's status as a holder in due course could be so readily undermined by such tenuous claims.

"Barclay's allegation of fraud in Taiwan has nothing to do with BOC's having given value for Lucky Jewel's draft, or BOC's good faith, or BOC's lack of notice of any defenses to the draft. Nor does Barclay's facile argument that BOC should pursue some remedy other than this litigation in any way impugn BOC's status as a holder in due course. Under section 5-114 of the Uniform Commercial Code, a holder in due course is not required to pursue other available remedies as a condition to recovery on its draft. 'To draw on a letter of credit, the beneficiary need only establish that it has strictly complied with its essential requirements.' *(Banque Worms v Banque Commerciale Privee, supra,* 679 F Supp, at 1178, citing *Marino Indus. Corp. v Chase Manhattan Bank,* 686 F2d 112, 114.)"

The mere fact that the documents presented in connection with the letters of credit may have been complete forgeries and that no coffee was delivered to the trucker for export is insufficient to avoid payment under the letter of credit *(see, First Commercial Bank v Gotham Originals,* 64 NY2d 287; *Barclay Knitwear Co. v King'swear Enters., supra).* What is critical is whether the bills of lading complied with the requirements of the letters of credit or whether BCCC possessed actual knowledge of the fraud *(see, Chemical Bank v Haskell,* 51 NY2d 85) or otherwise acted in bad faith. Thus, according to the Court of Appeals in *First Commercial Bank v Gotham Originals (supra,* at 295): "Under the general rule the issuer must honor the draft when the documents presented comply with the terms of the letter of credit (Uniform Commercial Code § 5-114 [1]). But when a required document does not conform to the necessary warranties or is forged or fraudulent or there is fraud in the transaction, an issuer acting in good faith may, but is not required to, refuse to honor a draft under a letter of credit when the documents

presented appear on their face to comply with the terms of the letter of credit. Further than that, a customer may also enjoin an issuer from honoring such a draft if the issuer fails to do so on its own * * *. Notwithstanding this exception, if the person presenting a draft drawn on a letter of credit is a holder in due course * * * the issuer *must* pay the draft, whether it has notice of forgery or fraud or not".

It is settled that New York law mandates strict compliance with the terms of a letter of credit *(United Commodities-Greece v Fidelity Intl. Bank,* 64 NY2d 449, 455; *Eximetals Corp. v Pinheiro Guimaraes,* 73 AD2d 526, *affd* 51 NY2d 865). The postdating of bills of lading is not only a departure from the requirements of the letters of credit but also constitutes a form of fraudulent practice. Contrary to the Supreme Court's characterization that the objections to the accompanying documents raised by NatWest and Rabobank were frivolous and highly technical, the discrepancies were, in reality, material. At the very least, they would have had the effect of concealing the actual shipment dates (even assuming that they had represented genuine, and not fictitious, transactions) and, in fact, did not, as required by the letters of credit, "evidence shipment" of the coffee. Further, while there is authority that by its previous acceptance of nonconforming documents, as admittedly occurred herein, the issuing bank does not waive the right to reject future defects *(Courtaulds N. Am. v North Carolina Natl. Bank,* 528 F2d 802; *Texpor Traders v Trust Co. Bank,* 720 F Supp 1100; *Far E. Textile v City Natl. Bank & Trust Co.,* 430 F Supp 193), and the preclusion rule contained in the UCP (Uniform Customs and Practice for Documentary Credits) is by no means absolute, at most the failure to assert an objection on a previous occasion presents a question of fact as to whether there was a waiver *(see, Eximetals Corp. v Pinheiro Guimaraes, supra).*

Unless the postdating was expressly allowed under the letters of credit, and there is no indication that this is the situation, or the parties' prior course of conduct conclusively demonstrates otherwise, the documents provided under the letters of credit did not comply with the terms thereof, and BCCC may not compel payment. Equally significant is the BCCC's apparently active role in obtaining the revisions of the documents, particularly after it was confirmed with definite proof of Gonchecol's financial instability in the form of a bad check, raises questions of fact as to whether it was acting in good faith and without actual knowledge of the exporter's

fraud. The record of the present matter clearly presents sufficient unresolved matters precluding summary judgment as to whether BCCC participated in a scheme whereby the bills of lading were altered simply to render them in conformity with the letters of credit. Once it has been "shown that a defense exists a person claiming the rights of a holder in due course has the burden of establishing that he or some person under whom he claims is in all respects a holder in due course" (Uniform Commercial Code § 3-307 [3]). Since NatWest and Rabobank have demonstrated a viable defense with respect to the letters of credit, BCCC must now prove that it is a holder in due course, and, consequently, summary judgment in its favor is not warranted.

Order and judgment (one paper) of the Supreme Court, New York County (Burton S. Sherman, J.), entered on August 31, 1989, which denied the motion for summary judgment by defendant National Westminster Bank USA, granted the cross motion for summary judgment by defendant Banco Credito y Commercio against defendant National Westminster Bank USA, ordered that defendant Banco Credito y Commercio recover a total amount of $3,944,064, including interest, against defendant National Westminster Bank, dismissed the cross claims of defendant National Westminster Bank against defendant Banco Credito y Commercio and vacated a temporary restraining order entered on August 26, 1986 barring payment upon two specified letters of credit, should be reversed, on the law, to the extent appealed from, and the cross motion for summary judgment by defendant Banco Credito y Commercio denied, the monetary award in favor of defendant Banco Credito y Commercio vacated, the cross claims by defendant National Westminster Bank against defendant Banco Credito y Commercio reinstated and the temporary restraining order reinstated, without costs or disbursements.

Order and judgment (one paper) of the Supreme Court, New York County (Burton S. Sherman, J.), entered on August 31, 1989, which denied the motion for summary judgment by defendant Cooperatieve Centrale Raiffeisenboerenleenbank B.A. (Rabobank Nederland), granted the cross motion for summary judgment by defendant, Banco Credito y Commercio, ordered that defendant Banco Credito y Commercio recover a total amount of $2,530,250, including taxes, against defendant Rabobank Nederland, dismissed the cross claims of defendant Rabobank Nederland against defendant Banco Credito y Commercio and vacated a temporary restraining order entered on

August 29, 1986 barring payment upon two specified letters of credit, should be reversed, on the law, to the extent appealed from, and the cross motion for summary judgment by defendant Banco Credito y Commercio vacated, the cross claims by defendant Rabobank Nederland against defendant Banco Credito y Commercio reinstated and the temporary restraining order reinstated, without costs or disbursements.

MURPHY, P. J., CARRO, ASCH and WALLACH, JJ., concur.

Order and judgment (one paper), Supreme Court, New York County, entered on August 31, 1989, which, *inter alia,* denied the motion for summary judgment by defendant National Westminster Bank USA, unanimously reversed, on the law, to the extent appealed from, the cross motion for summary judgment by defendant Banco Credito y Commercio denied, the monetary award in favor of defendant Banco Credito y Commercio vacated, the cross claims by defendant National Westminster Bank USA against defendant Banco Credito y Commercio reinstated, and the temporary restraining order reinstated, without costs and without disbursements; and,

Order and judgment (one paper) of said court, also entered on August 31, 1989, which, *inter alia,* denied the motion for summary judgment by defendant Cooperatieve Centrale Raiffeisenboerenleenbank B.A., unanimously reversed, on the law, to the extent appealed from, the cross motion for summary judgment by defendant Banco Credito y Commercio denied, the monetary award in favor of Banco Credito y Commercio vacated, the cross claims by defendant Rabobank Nederland against defendant Banco Credito y Commercio reinstated and the temporary restraining order reinstated, without costs and without disbursements.