### BRENNTAG INTERNATIONAL CHEMICALS, INC., Plaintiff,

v.

### NORDDEUTSCHE LANDESBANK GZ and Bank of India, Defendants.

### No. 97 Civ. 2688(RWS).

United States District Court,
S.D. New York.

Nov. 5, 1999.

---

**15.** Def. 56.1 St. ¶¶ 78, 82–86.

Katten, Muchin & Zavis, Chicago, IL, James C. Murray, Jr., Christian T. Kemnitz, of counsel, Howard, Darby & Levin, New York City, Linda C. Goldstein, of counsel, for plaintiff.

McDermott, Will & Emery, New York City, Banks Brown, of counsel, for Defendat Norddeutsche Landesbank GZ.

Sidley & Austin, New York City, James D. Arden, John J. Lavelle, of counsel, for Defendant Bank of India.

*OPINION*

SWEET, District Judge.

Brenntag International Chemicals, Inc. ("Brenntag") has moved, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for summary judgment, seeking to permanently enjoin defendant Bank of India ("BOI") from drawing upon a standby letter of credit (the "LOC") issued by defendant Norddeutsche Landesbank GZ ("Nord/LB"). For the reasons set forth below, the motion is granted.

Brenntag, through aggressive and effective lawyering, has previously succeeded in securing jurisdiction in this forum and obtaining a preliminary injunction. *See Brenntag Int'l Chems., Inc. v. Norddeutsche Landesbank GZ*, 9 F.Supp.2d 331 (S.D.N.Y.1998) (the "Injunction"), *aff'd sub nom., Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245 (2d Cir.1999) (the "Appeal"). Now, proffering much the same facts and argument as in the Injunction and Appeal, Brenntag seeks summary judgment and final relief. BOI disputes certain peripheral factual matters, but the critical fact at the center of this case remains unchanged: BOI took an undated default letter from beneficiary Petro Pharma Pte, Ltd. ("Petro Pharma"), paid Petro Pharma approximately $2.4 million for the LOC and its supporting documentation, including the default letter and certain false papers, and, when the LOC became due, stamped an appropriate date on the default letter and presented it along with the other documentation to Nord/LB for payment. These actions, even when viewed in the light most favorable to BOI, deprived BOI of holder in due course status and bar its recovery.

### Prior Proceedings

Brenntag initiated this action on April 16, 1997, seeking an injunction to bar payment on the LOC. A preliminary injunction was granted, which was affirmed by the Appeal on April 26, 1999.

During and after these events, discovery proceeded, including document production and the taking of depositions of almost all of the participants in the events at issue.

The instant motion was marked fully submitted on September 1, 1999.

### The Parties

Brenntag is a Texas corporation with its principal place of business in Houston, Texas.

Nord/LB is a foreign banking organization, formed under the laws of Germany, with its principal place of business in Germany. It has offices in New York, New York.

BOI is a foreign banking organization formed under the laws of India, with its principal place of business in India. BOI has banking offices in Singapore and New York, New York, among other places. BOI is an "agency or instrumentality" of India which carries on commercial business at its place of business in New York.

### The Facts

Although the facts have previously been recounted in rather exhaustive fashion in the Injunction, see *Brenntag*, 9 F.Supp.2d at 333–41, and the Appeal, see *Brenntag*, 175 F.3d at 247–49, familiarity with which is assumed, they are set forth again below, cast in the light most favorable to BOI as the non-moving party in a summary judgment motion.

The case before the Court is a murky tale of a letter of credit and a shipment—or lack thereof—of naphtha.[1]

Brenntag and Petro Pharma are chemical companies, which, at the time of the crucial events giving rise to the instant action, had an ongoing relationship. Robert Veenkuyzen ("Veenkuyzen"), who became president of Brenntag in 1994, had previously been a vice-president of Lucky Goldstar International (America) Inc. ("LGIA"). LGIA had acted in 1993 as the middleman on a transaction between Petro Pharma and Reliance Industries Limited ("Reliance"), in which Petro Pharma sold naphtha to LGIA, which sold it in turn to Reliance. In connection with that transaction, LGIA procured a standby letter of credit in favor of Petro Pharma.

In May 1995, Petro Pharma opened an account at BOI, which obtained from Narasimhan Ashok ("Ashok") and Mrs. Rema Ashok ("Mrs.Ashok"), both principals of Petro Pharma, personal guarantees of Singapore $5 million, as well as a corporate guarantee. Transactions between Brenntag and Petro Pharma, similar to the one described in the previous paragraph

between LGIA and Petro Pharma, were structured on at least two occasions prior to the transaction at issue in the instant action. In those prior transactions, Petro Pharma sold chemicals to Brenntag, which in turn re-sold them to a third party. In both cases, Brenntag obtained from Nord/LB a standby letter of credit to pay for the chemicals. Petro Pharma, the beneficiary of the letters, each time negotiated them with the necessary supporting documentation to BOI. This supporting documentation included undated claim letters submitted prior to the due date, and an independent inspection report that the goods had been physically loaded for transportation and delivery.

By early 1996, Petro Pharma was indebted to Brenntag in excess of $1 million. Brenntag pressed for payment, and on February 16, 1996, Ashok advised Veenkuyzen that Petro Pharma would shortly make a first payment of $700,000 and that "Reliance is helping with some loan." John Pichola ("Pichola"), Brenntag's controller, advised Veenkuyzen that Petro Pharma was working on a "packing loan" to reduce its debt to Brenntag.

A packing loan is a form of short-term, pre-shipment financing by which a supplier obtains funds to purchase, process, and pack goods for shipping. It is not a loan generally used to pay down antecedent debt and lasts only until the shipment is made and shipping documents are generated, at which time the documents are to be negotiated under a letter of credit, the proceeds then being used to pay off the packing loan. On March 6, Pichola telexed Ashok inquiring about the status of the loan.

On March 19, 1996, Brenntag received a wire transfer of $780,000 from Petro Pharma. Brenntag also received an unsigned contract from Reliance, dated March 13, 1996, for a purchase of naphtha from Brenntag. Brenntag also issued a con-

---

1. Naphtha is "any of various mixtures of volatile flammable liquid distillation products used especially as solvents and in petrol."

The New Shorter Oxford English Dictionary 1882 (1993 ed.)

tract to purchase naphtha from Petro Pharma, and agreed to provide a standby letter of credit in Petro Pharma's benefit to secure payment for the naphtha. Brenntag did not request a letter of credit from Reliance, although such letters had been required in the two previous transactions.

On March 21, 1996, Brenntag caused its bank, Nord/LB, to issue the LOC for the benefit of Petro Pharma in the amount of $2,340,000, plus or minus five percent. The LOC was "payable at sight, but not earlier than 361 days after the loading date, at [Nord/LB's] counters, against presentation" of (1) an invoice for the specified quantity of naphtha; (2) a copy of a negotiable bill of lading; (3) a copy of the beneficiary's covering letter; and (4) a statement from Petro Pharma that "payment, which was due 360 days after completion of loading, has not been received and is due from Brenntag International Chemicals, Inc." (the "Default Letter").

The LOC restricted negotiation to BOI, required that Petro Pharma send all original negotiable documents directly to Nord/LB upon shipment, and was subject to the Uniform Customs and Practice for Documentary Credits (1993 Revision), Publication No. 500 of the International Chamber of Commerce, Paris, France (the "UCP").

On March 22, 1996, the Letter of Credit was amended to change the expiration date from March 17, 1997 in New York to June 30, 1997 in New York. Nord/LB sent the amendment to BOI. Also on March 22, Petro Pharma wrote to BOI to request negotiation of the LOC. The request was signed by Petro Pharma Treasury Director B. Aranprasad ("Prasad") and Finance Manager Venkat A. Iyer ("Iyer"), both of whom, at the time, were authorized signatories of Petro Pharma. Before joining Petro Pharma, Prasad worked at BOI for four years as the Manager of Trade Finance (Export), where he dealt with letters of credit. Some Nath Banerjee ("Banerjee"), who assumed Prasad's responsibilities at BOI, knew Prasad. Banerjee was responsible for evaluating Petro Pharma's negotiation request.

Attached to the request letter were the documents purportedly required by the LOC: (1) an alleged copy of the "covering letter" to Nord/LB which acknowledged that Petro Pharma had sent all original negotiable documents to Nord/LB in New York via courier service directly upon shipment (the "Covering Letter"); (2) an alleged copy of a bill of lading purporting to evidence the shipment of naphtha on March 18, 1996 (the "Bill of Lading"); (3) an invoice for $2,483,605.48 (the "Invoice"); and (4) an undated claim letter form (the "Default Letter").

The Default Letter—which was undated—stated that Brenntag's "payment, which was due 360 days after completion of loading, has not been received and is due from Brenntag International Chemicals, Inc." It was signed by Prasad and Iyer. Banerjee, who reviewed the documents, acknowledged in deposition testimony that he knew that the statement in the Default Letter that payment was overdue was not true and could not have been true at the time he reviewed the documents.

The Invoice, dated March 18, 1996, stated that payment terms were "360 days from the bill of lading" for $2,483,605.48, based on the unit price of $158/metric ton. This amount was inconsistent with the LOC value of $2,340,000. BOI initially noted this as a "discrepancy" on its internal form and pointed out the inconsistency to Petro Pharma.

The Invoice was false. The *M/T Crystal River*, listed as the carrier for the naphtha, which was to be loaded in Indonesia and shipped to India, was actually en route from Saudi Arabia to Alaska and never shipped the naphtha.

According to the LOC, Petro Pharma was to send "all original negotiable documents" directly to Nord/LB via courier service upon shipment of the naphtha and

submit a copy of the "covering letter" to these documents for payment under the LOC. Nord/LB never received the original documents. BOI made no inquiry concerning the original negotiable documents.

After the LOC was issued, Petro Pharma requested that Brenntag direct Nord/LB to issue to BOI the following confirmation by tested telex:

We hereby confirm that

1. No payment has been made as of date by Norddeutsche Landsbank GZ, in respect of this transaction, directly to Petro Pharma Pte Ltd., Singapore outside this Letter of Credit.

2. Any/all payments to be made in respect to this transaction will be made only to Bank of India, Singapore (to whom this Letter of Credit is restricted to) by Norddeutsche Landesbank GZ, New York quoting this Letter of Credit number and date.

Petro Pharma also requested additional telexes from Brenntag and an amendment on the LOC as to unit price. By memorandum to Pichola, Prasad of Petro Pharma stated that with the requested telexes in hand, "I can go to Bank of India, show them that whatever paperwork formalities they wanted completed has been done, and then push them to give ... approval for the Packing Loan." Brenntag approved the requested confirmation and Nord/LB issued it by telex on March 25, 1996.

On March 26, 1996, BOI concluded that "everything was in order," deducted $195,-685.49 for its interest and charges from the anticipated invoice amount, and disbursed the remainder of the requested funds in accordance with Petro Pharma's directions: $1,810,000 to the Standard Chartered Bank to the account from which Brenntag had previously been paid, and the remainder to Petro Pharma's checking account.

Brenntag's first communication from Reliance concerning the transaction after receiving the contract was a June 22, 1996 memorandum by fax advising that Reliance was cancelling the contract.

On June 30, 1996, Prasad, one of the signatories to the Default Letter, resigned from Petro Pharma, and BOI received the Petro Pharma Board Resolution replacing Prasad with Gandarvakotlai Raghaven ("Raghaven"), an authorized signatory. By fax dated July 16, 1996, Reliance agreed to an extension of the purported naphtha contract into August which called for automatic cancellation, apparently without liability to either party.

In August 1996, BOI began having difficulty with Petro Pharma's account and a $728,000 advance. On August 28, 1996, BOI sent to Nord/LB a fax asking Nord/LB to "acknowledge receipt of documents submitted by the beneficiary directly to you as per terms of LC." On September 3, 1996, Nord/LB responded that the documents "have not yet been received."

According to Raghaven, who was Ashok's brother-in-law, Banerjee requested another default letter, a request which Raghaven alleged he denied since no default had yet occurred. The substance of this conversation is denied by Banerjee.

On March 14, 1997, Banerjee directed a BOI clerk to stamp "March 14, 1997" on the Default Letter signed by former Petro Pharma employee Prasad, and submitted the Default Letter and the copies of other documents it had received a year earlier to Nord/LB. On March 18, 1997, Nord/LB asserted several discrepancies, including the failure to receive the original documents, and stated that the documents were being held "at your disposal."

It is standard practice in Singapore and other Asian markets to take a claim letter required by a standby letter of credit prior to maturity (and therefore prior to default or any other event stated in the claim letter), to hold the claim letter (along with the other stipulated documents) until maturity, and then to present the documents at that time to the issuing bank for pay-

ment. This is not a standard practice in the New York letter of credit market. The discounting of documents under standby letters of credit prior to default is a banking practice followed in Singapore.

### Discussion

### Summary Judgment Is Appropriate

Rule 56(c) of the Federal Rules of Civil Procedure provides that a motion for summary judgment may be granted when "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The Second Circuit has repeatedly noted that "as a general rule, all ambiguities and inferences to be drawn from the underlying facts should be resolved in favor of the party opposing the motion, and all doubts as to the existence of a genuine issue for trial should be resolved against the moving party." *Brady v. Town of Colchester*, 863 F.2d 205, 210 (2d Cir.1988) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n. 2, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (Brennan, J., dissenting)); *see Tomka v. Seiler Corp.*, 66 F.3d 1295, 1304 (2d Cir.1995); *Burrell v. City Univ.*, 894 F.Supp. 750, 757 (S.D.N.Y.1995). If, when viewing the evidence produced in the light most favorable to the nonmovant, there is no genuine issue of material fact, then the entry of summary judgment is appropriate. *See Burrell*, 894 F.Supp. at 758 (*citing Binder v. Long Island Lighting Co.*, 933 F.2d 187, 191 (2d Cir.1991)).

Materiality is defined by the governing substantive law. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "[T]he mere existence of factual issues— where those issues are not material to the claims before the court—will not suffice to defeat a motion for summary judgment."

*Quarles v. General Motors Corp.*, 758 F.2d 839, 840 (2d Cir.1985).

Courts of this district have repeatedly held that " '[a]ctions concerning letters of credit are well suited to determination by motion for summary judgment because they normally present solely legal issues relating to an exchange of documents.' " *Cooperative Agricole Groupement De Producteurs Bovins De L'Ouest v. Banesto Banking Corp.*, No. 86 Civ. 8921(PKL), 1989 WL 82454, at *2 (S.D.N.Y. July 19, 1989), *aff'd*, 904 F.2d 35 (2d Cir.1990) (*quoting Banque Worms v. Banque Commerciale Privee*, 679 F.Supp. 1173, 1178 (S.D.N.Y.1988)), *aff'd*, 849 F.2d 787 (2d Cir.1988); *Chelsey Originals, Inc. v. D&Art, Inc.*, No. 91 Civ. 5394(CSH), 1992 WL 176597, at *2 (S.D.N.Y. July 15, 1992) ("Letters of credit are appropriately resolved by summary judgment since the parties dispute the significance of events rather than issues of fact."); *Bank of Cochin Ltd. v. Manufacturers Hanover Trust Co.*, 612 F.Supp. 1533, 1537 (S.D.N.Y. 1985), *aff'd*, 808 F.2d 209 (2d Cir.1986).

In most respects, BOI's counter-statement of material facts pursuant to Local Rule 56.1 does not significantly challenge Brenntag's statement of material facts, except with regard to matters adduced from Raghaven's deposition testimony which have been explicitly contradicted by Banerjee. These matters concern Banerjee's knowledge and action in March 1997, his knowledge of actions against Petro Pharma taken by other banks, Raghaven's denial of the propriety of a default, and Banerjee's alleged request for a new default letter. For the purposes of this motion, Banerjee's testimony is accepted.

The remainder of the challenges to Brenntag's Rule 56.1 statement have been accepted as to factual matters and disregarded when the challenge was to the legal conclusion to be drawn from a particular fact. As indicated above, the Court has accepted for purposes of this motion BOI's contentions regarding banking practices in

Singapore, and the prior history of the Brenntag/Petro Pharma relationship.

BOI has also characterized the Brenntag/Petro Pharma/Reliance transaction for which the LOC was produced as a "sham transaction." BOI's factual contentions regarding the transaction have been accepted by the Court. However, these facts, viewed in the light most favorable to BOI, fail to establish that Brenntag had knowledge of Petro Pharma's fraudulent plan. The receipt of payment on a prior indebtedness unrelated to the transaction, on the day the transaction was formed, does not establish the inference that Brenntag was a participant in the fraud.

There is no dispute concerning the facts establishing diversity jurisdiction.

### The Default Letter As Submitted Did Not Comply With The LOC

The LOC is subject to, and thus governed by, the UCP, the crucial provisions of which, for purposes of the instant action, are Articles 10(d) and 13(a). Article 10(d) provides in pertinent part that:

> [B]y allowing for negotiation ... the Issuing Bank authorizes [the negotiating] bank to pay, accept Draft(s) or negotiate as the case may be, against documents which appear on their face to be in compliance with the terms and conditions of the Credit....

■ Article 13(a) provides in part:

> Banks must examine all documents stipulated in the Credit with reasonable care, to ascertain whether or not they appear, on their face, to be in compliance with the terms and conditions of the Credit. Compliance of the stipulated documents on their face with the terms and conditions of the Credit, shall be determined by international standard banking practice as reflected in these Articles. Documents which appear on their face to be inconsistent with one another will be considered as not appearing on their face to be in compliance with the terms and conditions of the Credit.

As the UCP makes clear, banks are required to scrutinize closely the documents presented to them and accept only documents that comply precisely with the letter of credit. *See Alaska Textile Co. v. Chase Manhattan Bank*, 982 F.2d 813, 816 (2d Cir.1992); *Corporacion de Mercadeo Agricola v. Mellon Bank Int'l*, 608 F.2d 43, 47 (2d Cir.1979); UCP Art. 14(a). Absent such protection against nonconforming documents, the applicant is exposed to abuse by the beneficiary. *See Banque Paribas v. Hamilton Indus. Int'l, Inc.*, 767 F.2d 380, 384 (7th Cir.1985). Whether documents conform to the letter of credit is for the court to decide, and when the documents patently fail to do so, summary judgment is appropriate. *See Mueller Co. v. South Shore Bank*, 991 F.2d 14, 16 (1st Cir.1993) (strict compliance doctrine violated by an invoice dated prior to May 24, 1990 when the letter of credit specifically required invoices dated after May 24, 1990).

■ The Default Letter received by BOI from Petro Pharma on March 22, 1996, certified that Brenntag's payment was overdue. That certification is impossible to reconcile with the other documents which made it clear that payment was not due for 360 days; the Default Letter itself indicated that it was only payable at sight 360 days from the date of the completion of loading of the shipment of naphtha, and the invoice indicated, under the heading "payment terms," that payment was due "360 days from date of bill of lading." The accompanying invoice and bill of lading, however, purported to evidence sale and shipment of the naphtha only four days earlier, on March 18, 1996. Banerjee, BOI's own document inspector, confirmed that the condition the Default Letter purported to certify could not have been true at the time he inspected the documents.

■ Under a letter of credit, "[f]alsified documents are the same as no documents at all." *Voest–Alpine Int'l Corp. v. Chase Manhattan Bank*, 707 F.2d 680, 686 (2d

Cir.1983). The documents in *Voest–Alpine,* like the documents at issue in this case, contained "irreconcilable inconsistencies": the bill of lading indicated that the goods were on board by January 31, 1991, as required by the letter of credit, but the weight certificates and certificates of inspection stated that the goods had been loaded on the vessel after February 2, 1981. *See id.* at 683.

Furthermore, UCP Article 13(a) makes clear that "[d]ocuments which appear on their face to be inconsistent with one another will be considered as not appearing on their face to be in compliance with the terms and conditions of the Credit." In *Osten Meat Co. v. First of America Bank,* 205 Mich.App. 686, 517 N.W.2d 742 (1994), *appeal denied,* 448 Mich. 939, 534 N.W.2d 525 (1995), the beneficiary submitted copies of an invoice stamped "paid" and an affidavit indicating that the invoices were unpaid. *See id.* at 744. Citing the UCP, the court held that dishonor was justified because the invoices were inconsistent with the affidavit and therefore noncompliant with the letter. *See id.* at 748.

The Second Circuit has affirmed the Injunction issued in the instant case, stating that acceptance of a facially false default letter fundamentally ignored the nature of the letter of credit at issue, which "was a stand-by, not a documentary, letter." *Brenntag,* 175 F.3d at 251. The Second Circuit noted that a letter certifying the default of the purchaser is essential to the purpose and operation of a standby letter of credit because it is "meant to be drawn upon only in the event that its applicant fails to make a direct payment to the beneficiary," and "the default [that the default letter] purported to certify had not and could not have occurred at the time that the letter was written." *Id.* Because of that patent falsity, the Second Circuit concluded that the Default Letter was "obviously noncompliant with the LOC's requirements." Those conclusions remain unchanged.

Evidence has been adduced by BOI of banking practices in Singapore to the effect that undated default letters are accepted, post-dated, and used to negotiate standby letters of credit. Such a practice does not comport with the UCP and the authorities cited above and profoundly alters the nature of a standby letter of credit which guarantees payment only if the purchaser defaults.

In fact, on a prior occasion, Brenntag had made payment prior to the default date. The provision in the LOC that payment was to be made only at BOI, added by Nord/LB at BOI's request relayed by Brenntag, did not change the documentation required by the LOC. BOI may have relied on the undertaking, but that did not alter the fact that the Default Letter was false when received and altered not by the maker but by BOI. It thus failed to satisfy the facial requirements of the LOC.

### BOI Was Not A Holder In Due Course

It is conceded that Petro Pharma committed fraud and that the invoice was false in every regard. Petro Pharma represented to Brenntag that it sought a packing loan out of which its debt reduction payment would be made and that it intended to have BOI discount the transaction.

Under New York U.C.C § 5–114(2), Brenntag is entitled to relief if BOI's demand for payment relates to a fraudulent transaction or is accompanied by false or forged documents, unless the holder of the documents received them under "circumstances which would make it a holder in due course." N.Y.U.C.C. § 5–114(2)(a) (McKinney 1999); *Voest–Alpine,* 707 F.2d at 686;· *Gillman v. Chase Manhattan Bank,* 73 N.Y.2d 1, 537 N.Y.S.2d 787, 795–96, 534 N.E.2d 824 (1988); *Sztejn v. J. Henry Schroder Banking Corp.,* 177 Misc. 719, 31 N.Y.S.2d 631, 634 (Sup.Ct. 1941). The New York U.C.C. § 5–114(2) prohibits honoring facially valid documents in a transaction involving fraud even if the letter of credit is governed by the UCP because the UCP does not itself address

fraud. *See Bank of Cochin*, 612 F.Supp. at 1542. As set forth in the Injunction, although the application of New York U.C.C. § 5–114(2) to this transaction is unnecessary because the UCP directly disapproves of facially invalid documents, cases decided under the U.C.C. nonetheless apply by analogy. *See Brenntag*, 9 F.Supp.2d at 343.

U.C.C. § 5–114(2) provides more fully:

[u]nless otherwise agreed when documents appear on their face to comply with the terms of a credit but a required document does not in fact conform to the warranties made on negotiation ... or is forged or fraudulent or there is fraud in the transaction

(a) the issuer must honor the draft or demand for payment if honor is demanded by a negotiating bank or other holder of the draft or demand which has taken the draft or demand under the credit and under circumstances which would make it a holder in due course (Section 3–302) ...; and

(b) in all other cases as against its customer, an issuer acting in good faith may honor the draft or demand for payment despite notification from the customer of fraud, forgery or other defect not apparent on the face of the documents but a court of appropriate jurisdiction may enjoin such honor.

■ Where, as here, a plaintiff establishes in the first stage of the inquiry that fraud occurred, a defendant "has the full burden of proof by a preponderance of the total evidence on this issue. The burden must be sustained by affirmative proof...." *Scarsdale Nat'l Bank & Trust Co. v. Toronto–Dominion Bank*, 533 F.Supp. 378, 386 n. 12 (S.D.N.Y.1982) (citations omitted).

In *Scarsdale*, a standby letter of credit required certificates stating that the seller had performed certain duties required by the underlying contract. *See Scarsdale*, 533 F.Supp. at 379–80. Shortly after the letter was issued and before performance was complete, the seller submitted the certificates along with a demand under the letter to a bank in exchange for financing. *See id.* at 383. By the time the bank submitted the last of the certificates to the issuing bank, the seller had defaulted on his obligations and the issuing bank refused to pay. *See id.* at 384. The court found that the bank that released funds based on the certificates "had actual knowledge" that "the performance required by the certificates had not yet occurred" at the time it paid value. *Id.* at 386. Because of this knowledge, the court held that the bank's attempt to hide behind the "technical compliance with the paper requirements" amounted to "willful ignorance." *Id.* at 387. Because the bank accepted documents it knew to be false, the court concluded that it had acted in bad faith, was not a holder in due course, and was not entitled to be reimbursed for the money it had paid to its client. *See id.*

Similarly, in *Andina Coffee, Inc. v. National Westminster Bank*, 160 A.D.2d 104, 560 N.Y.S.2d 1 (1990), a negotiating bank accepted post-dated documents from the beneficiary, including bills of lading dated six weeks into the future, to finance the payment of goods that were never shipped. *See id.* at 2. When the negotiating bank claimed that it was a holder in due course and was entitled to payment regardless of any fraud in the underlying transaction, the issuing bank countered that the negotiating bank was aware of the fraud. *See id.* Holding that the post-dated documents were "not only a departure from the requirements of the letters of credit but also ... a form of fraudulent practice," the court concluded that unless the post-dating was expressly allowed under the letters of credit, the documents did not comply with the terms of the letter, and the bank was not entitled to payment. *Id.* at 4.

■ BOI knew that the undated Default Letter could not have reflected the actual condition it purported to certify. Nothing

in the present record contradicts the earlier finding, *see Brenntag,* 9 F.Supp.2d at 344, that Banerjee, the head of the BOI letter of credit department, admitted that when BOI accepted the undated Default Letter from Petro Pharma on March 22, 1996, the statement contained in the Default Letter—that "payment was due 360 days after completion of loading has not been received and is due and owing from Brenntag"—was not true and could not have been true. There is no provision in the LOC nor any authorization from Petro Pharma permitting BOI to date stamp the Default Letter when the due date arrived. Under these circumstances, the practice of Singapore bankers, if such it be, cannot constitute good faith. Were it otherwise, local banking practice could alter the terms of the instruments, and BOI has not advanced any authorities which so hold.

Because BOI is not a holder in due course it bears the risk of Petro Pharma's fraud. *See Brenntag,* 175 F.3d at 250; *KMW Int'l v. Chase Manhattan Bank,* 606 F.2d 10, 16 (2d Cir.1979); *United Bank Ltd. v. Cambridge Sporting Goods Corp.,* 41 N.Y.2d 254, 392 N.Y.S.2d 265, 360 N.E.2d 943, 948 (1976).

### The Practice of Banks in Singapore, Including BOI, Cannot Alter the LOC

In *Bank of Cochin, Ltd. v. Manufacturers Hanover Trust Company,* 808 F.2d 209 (2d Cir.1986), the Second Circuit interpreted Article 8(d) of the UCP according to its plain meaning and the policy underlying the operation of letters of credit. *See id.* at 213. Similarly, in *Alaska Textile,* cited by BOI, the court construed the meaning of "reasonable time" under Article 16(c) of the UCP according to its plain meaning and the interpretations given to it by other courts. *See Alaska Textile,* 982 F.2d at 821–22. Although the court relied on "law from foreign jurisdictions" and "expert testimony," the single case from a foreign jurisdiction interpreted the UCP without reference to actual practices, and the expert testimony was noted only insofar as the experts at issue agreed with the

court's interpretation. *See id.; see also 3Com Corp. v. Banco de Brasil,* 2 F.Supp.2d 452, 457 (S.D.N.Y.1998), *aff'd,* 171 F.3d 739 (2d Cir.1999) (interpreting the UCP according to "general principles and policies which underlie the UCP's express terms").

Nothing in the UCP supports BOI's contention that accepting facially false documents is not bad faith under the UCP. BOI has cited no case in this Circuit where a court has abandoned the plain meaning of the UCP to examine specific banking practices.

 The stated purpose of the UCP is to facilitate international trade by providing a uniform set of rules accepted around the world. It has been characterized as a "compilation of internationally accepted commercial practices." *Semetex Corp. v. UBAF Arab Am. Bank,* 853 F.Supp. 759, 769 (S.D.N.Y.1994), *aff'd,* 51 F.3d 13 (2d Cir.1995); *Sempione v. Provident Bank,* 75 F.3d 951, 960 (4th Cir.1996) ("The UCP is a formulation of standard international banking practice."), *dismissed on other grounds,* 85 F.3d 615 (4th Cir.1996). The analysis urged by BOI would alter the UCP and the standards governing letters of credit into a fragmented patchwork of local customs and practices, the very problem letters of credit and the UCP were designed to avoid.

BOI cited *Sempione* as considering evidence of banking practices, but the court made no inquiry into any practice prevalent in the location of the confirming bank, *i.e.,* any *local* practice. In the other case upon which BOI relies heavily, *Alaska Textile,* the court interpreted the term "reasonable time" as used in the UCP. *See Alaska Textile,* 982 F.2d at 820–25. There, our Circuit refused to interpret a reasonable time as the three-day limit customary in New York because the drafters had refused to articulate a fixed time. Among other sources, the court cited an article attributing the absence of a specific limit in the UCP to "a disparity of opinion

on the question of what is a 'reasonable time' which precluded international consensus of a particular period." *Id.* at 822 (*quoting* Robert M. Rosenblith, *Lawyer Robert M. Rosenblith Looks at UCC Provisions Against UCP Rule,* 6 Letter of Credit Update 11 (Feb.1990)). BOI concedes a similar disparity of opinion in the practice at issue, which it claims is "standard in Asian and other international markets, but not in New York." The plain language of the UCP does not suggest deference to such disparity.

### BOI Has Not Established A Valid Defense

■■■ BOI has not cited any case where an applicant's conduct in the underlying transaction was considered in the adjudication of rights under the letter of credit. The "independence principle" makes Brenntag's conduct in the underlying transaction irrelevant to determining the parties' rights under the LOC. *See Alaska Textile,* 982 F.2d at 815. Despite conclusory characterization of the underlying transaction as a "sham" or a "scheme" to swindle BOI, BOI has at most adduced that the Brenntag/Petro Pharma transaction differed from their earlier transactions in certain regards. No evidence has been presented to establish that Brenntag or its officials were aware of Petro Pharma's fraud.

### Injunction Is An Appropriate Remedy

This Court obtained jurisdiction over this dispute at the time of Brenntag's initial injunction application. BOI challenged the propriety of injunctive relief on the ground that Brenntag was not a party to the LOC and that there was an absence of irreparable injury. BOI has maintained that it was entitled to seek to enforce the LOC against Nord/LB, and that any ultimate liability of Brenntag was calculable and not irreparable. This contention was rejected in the Injunction and on the Appeal, and that rejection is now the law of this case. No additional authority has been advanced to alter those conclusions.

However, BOI does not dispute this Court's power to enjoin Nord/LB—which has been part of the litigation from the onset and with whom Brenntag is in direct contractual privity—from paying against the LOC. In addition, the UCP puts no explicit limits on this Court's power to "examine all documents stipulated in the Credit with care." UCP Art. 13.

The BOI authorities are not to the contrary. None of them involves a suit by an applicant against a negotiating bank. Moreover, many of the cases cited involve only the U.C.C. or make no mention of the UCP, and therefore provide no insight into Brenntag's rights under the UCP. Finally, in none of the cases cited by BOI did a negotiating bank knowingly take false documents, as BOI did here.

### Nord/LB's Initial Assertion Of Discrepancies Does Not Bar Injunctive Relief

BOI has cited cases holding that injunctions may not issue after an issuing bank accepts documents for payment, and concludes that the same result should apply when the issuer decides not to honor a demand for payment. In two cases cited by BOI, the issuing banks had already accepted a draft under a letter of credit before the plaintiffs sought an injunction. *See First Commercial Bank v. Gotham Originals, Inc.,* 64 N.Y.2d 287, 295, 486 N.Y.S.2d 715, 475 N.E.2d 1255 (1985); *Southern Indus. v. Fame Trading Registered,* No. 89 Civ. 247(MBM), 1989 WL 82411, at *2 (S.D.N.Y. July 21, 1989). In *First Commercial,* an injunction was precluded because once the bank accepted the draft, § 4–303(1)(a) of the U.C.C. (which supersedes § 5–114) irrevocably obligated the bank to pay and any legal objections came "too late." *See First Commercial,* 64 N.Y.2d at 292, 486 N.Y.S.2d 715, 475 N.E.2d 1255. In *Fame Trading,* the court concluded that the negotiating bank was a holder in due course because, *inter alia,* it was unaware of fraud in the underlying transaction.

Here, however, as the has Circuit concluded, there is something left to enjoin. Nord/LB notified BOI that it was rejecting BOI's claim and asserted certain discrepancies in a letter on March 14, 1997. When the temporary restraining order was entered on April 16, 1997, one month after Nord/LB's initial response, five weeks remained before the LOC would expire. *See* Dolan, *The Laws of Letters of Credit* ¶ 5.03[3][b], p. 5–37 (rev. ed.1996). Indeed, under BOI's interpretation of § 5–114, a court could only enjoin a payment in a transaction marked by fraud if a bank had neither accepted nor rejected documents.

In assessing irreparable harm, the Second Circuit concluded that Nord/LB's dishonor "hardly demonstrates the absence of irreparable harm, as this litigation again demonstrates, for BOI has continued its attempts to gain payment under it." *Brenntag,* 175 F.3d at 250.

### Conclusion

For the reasons set forth above, the motion is granted.

Settle judgment on notice.

It is so ordered.