452 So.2d 587 (1984)
BARNETT BANK OF PALM BEACH COUNTY, N.A., Appellant,
v.
REGENCY HIGHLAND CONDOMINIUM ASSOCIATION, INC., Melvin T. Goldberger, et Ux., et al., Appellees.
No. 82-1926.
District Court of Appeal of Florida, Fourth District.
May 9, 1984.
Rehearing Denied June 26, 1984.
*588 John B. McCracken and Matthew S. Nugent of Jones & Foster, P.A., West Palm Beach, for appellant.
Robert A. Eisen of Marchbanks & Eisen, P.A., Boca Raton, for appellees.
DOWNEY, Judge.
Regency Highlands Condominium Association, Inc., filed an action against a Partnership, Regency Highlands Associates, which developed the condominium, and Barnett Bank of Delray Beach, which provided some of the financing for the condominium. The Bank counterclaimed against the Condominium Association to recover on a note the Association executed in favor of the Partnership, which the Partnership had given to the Bank as collateral for a loan the Partnership obtained from the Bank. From an adverse final judgment the Bank has appealed.
In 1974, the partners executed in favor of the Bank loan guarantees for any loans the Partnership obtained for the condominium. In 1975 the Partnership borrowed $100,000 from the Bank for use in the development of the condominium. A 90-day promissory note dated April 29, 1975, evidenced the loan.
During the next three years the Partnership paid interest and renewed the note. On January 16, 1978, Goldberger, as trustee for the Partnership, assigned to the Bank as collateral for the last renewal note (which had a principal sum of $75,000) a note in the face amount of $148,860.90 payable to the Partnership. The collateral note was a promissory note executed by the Association to repay money advanced by the Partnership to pay for improvements that benefited the Condominium Association. The due date shown on the collateral note was December 31, 1978. Also contained on the face of the note was the legend: "Payment to be made as Capital Contributions are received from each apartment closing." When the Partnership failed to pay off the $75,000 secured note, i.e. the last renewal note, the Bank sought in a counterclaim against the Association to recover on the collateral note the Partnership had assigned to it as security for the renewal note.
The Association contended in its amended answer to the Bank's counterclaim that the collateral note did not represent a lawful obligation because it was obtained by fraud and trickery and that the note was not negotiated to the Bank for value and was thus subject to all defenses the Association had as against the Partnership.
At trial the Bank introduced the collateral note in the face amount of $148,860.90 into evidence, together with the testimony of a certified public accountant that as of January 18, 1978, payments from the Association to the Partnership had reduced the balance due on the note to $74,057. All parties agree that no further payments were made on the note after control of the Association passed from the Partnership to the unit owners on January 18, 1978.
In the final judgment under review the trial court found that: (a) the collateral note was not negotiable because it was *589 conditional on its face; (b) if the note were negotiable, the facts and circumstances surrounding the assignment of the note to the Bank showed that the Bank did not take the note in good faith and without notice of the Association's defenses to it and so could not rise to the status of a holder in due course; and (c) the Bank did not present any credible evidence of the balance due on the note as of the date of its assignment to the Bank, January 16, 1978. The Bank says these findings are erroneous.
The issue raised in the Bank's first point on appeal is whether the statement on the note that "Payment to be made as Capital Contributions are received from each apartment closing" is a conditional promise to pay. If it is the note is non-negotiable and subject to any defenses the maker may have against the payee thereof.
In order for an instrument to be negotiable it must contain an unconditional promise to pay a sum certain in money. § 673.104(1)(b), Fla. Stat. (1981). However, an otherwise unconditional promise to pay is not made conditional by the fact that the instrument "Indicates a particular account to be debited or any other fund or source from which reimbursement is expected... ." § 673.105(1)(f), Fla. Stat. (1981). The law favors negotiability and is reluctant to adopt rules that burden transferability of negotiable paper. 11 Am.Jur.2d, § 398; 10 C.J.S. Bills and Notes, § 14. The terms of the instrument itself determine negotiability. 6 Fla.Jur.2d, Bills and Notes, § 17. Furthermore, the Uniform Commercial Code comment to Section 673.105, Florida Statutes, makes it clear that the conditional character of a promise to pay is not determined by matters dehors the instrument, but by the instrument itself. In pertinent part the comment states: "so far as negotiability is affected, the conditional character of the promise or order is to be determined by what is expressed in the instrument itself... ." 19B, F.S.A. 44. In addition, Section 673.105(2)(b) suggests that in order for a promise to be conditional the restrictive language must be express because that section provides:
"(2) A promise or order is not unconditional if the instrument:
* * * * * *
"(b) States that it is to be paid only out of a particular fund or source except as provided by this section."
In our view, the legend appearing on the face of the collateral note does not make the promise to pay conditional, since the legend contains no words explicitly limiting payment to a particular fund or source.
Next, the Bank contends the trial court erred in finding that it was not a holder in due course because it did not take the collateral note in good faith and without notice of the Association's defenses against the Partnership. In support of that finding the Association argues that the evidence demonstrates the Bank acted in bad faith because it purposefully and wilfully remained ignorant of the Association's claim against the validity of the note.
To be a holder in due course under Section 673.302, Florida Statutes (1981), a holder must take an instrument in good faith and "[w]ithout notice that it is overdue or has been dishonored or of any defense against or claim to it on the part of any person." The nuances of the term "good faith" are pointed up in the Tennessee case of K.T. McConnico v. Third National Bank in Nashville, 499 S.W.2d 874, 881 (Tenn. 1973), wherein the court stated:
It is clear that the U.C.C. defines `good faith' as `honesty in fact in the conduct or transaction concerned.' ... A holder need not exercise due care including the observance of reasonable commercial standard in addition to `honesty in fact' to be in good faith. The legislative history of § 3-302(1)(2) indicates that the language `including observance of reasonable commercial standards of any business in which the holder may be engaged' was deleted in the 1956 Recommendations and text. The comments to that section make clear `that the doctrine of an objective standard of good faith is *590 not intended to be incorporated in Article 3.' ... This means that unless the conduct amounts to dishonesty and bad faith, in fact, due course holder status is not lost, in so far as this test is involved.
Accord: Baraban v. Manatee National Bank of Bradenton, 212 So.2d 341 (Fla. 2d DCA 1968). So we see that good faith as used in Section 673.302 does not include due care; rather lack of good faith must be the result of actual, not constructive, knowledge of the wrongdoing tantamount to dishonesty or bad faith. As the McConnico court stated:
"`Though he may have been negligent in taking the paper, and omitted precautions which a prudent man would have taken, nevertheless, unless he acted in mala fide, his title according to the settled doctrine, will prevail.'" 499 S.W.2d at 882.
Here the Association alleges that the Bank purposefully and wilfully remained ignorant of the true facts surrounding the execution of the collateral note. The Association contends the Bank had notice of the Association's defenses, pursuant to Section 673.304(2), because the Bank took the collateral note with knowledge that the partners, who were fiduciaries of the Association, negotiated the instrument as security for the partners' own debt. While it is correct to say that notice that a fiduciary's negotiation of an instrument as security for his own personal debt gives a holder such notice as to destroy his status as a holder in due course, that statement is irrelevant here because it does not apply to the facts of this case. A typical situation putting a transferee on notice of existing claims exists where the president of a corporation, or a personal representative of an estate, or a trustee of a trust, negotiates a note payable to the corporation, or to the estate or the trust in payment of the president's or executor's or trustee's personal obligation to the bank. In the present case the Partnership negotiated to the Bank, as security for a Partnership obligation, a note issued to the Partnership by the Association. The aim of Section 673.304(2) is to discourage a fiduciary's using his beneficiary's money to pay his own debts. Here the Partnership was paying (or securing) a Partnership obligation (its note to the Bank) with a Partnership asset (the Association's note to the Partnership). We conclude that this activity does not fall within the purview of Section 673.304(2).
In analyzing the question of good faith and the evidence to support it, the Association cites ten alleged facts that it contends show bad faith. They involve such facts as a) the Bank knew the collateral note was issued in return for assets the Partnership purchased for the Association; b) the Bank knew the Partnership controlled the Association when the note was executed; c) the Bank did not follow its own internal operating procedure in accepting transfer of the note; d) the note contained a legend on its face providing that payment was to be made from the proceeds received from unit closings; e) the Bank knew that some payments had been made on the note so that the face amount of the note was not due; f) the Bank had the condominium documents in its file. We have carefully examined the entire list of allegations and hold that they are insufficient, individually or collectively, to support a finding of bad faith. To comment on just a few, departure from internal operating procedures does not show actual knowledge. Industrial Nat. Bank of R.I. v. Leo's Used Car Ex., Inc., 362 Mass. 797, 291 N.E.2d 603. Knowledge that the note was executed when the Partnership controlled the Association also does not prove the requisite knowledge of wrongdoing. Actually, the dispute as to the propriety of charging the cost of certain assets to the Association did not arise until the Association took over management of the condominium and obtained an audit and it took a lawsuit to resolve the various contentions of the parties. To require the Bank to foresee such things and inquire into the transaction underlying the collateral note would be to totally fetter negotiability. See 2 Anderson, Uniform Commercial Code, § 3-302:11 and cases cited therein.
*591 The following statement in Bankers Trust Co. v. Litton Systems, 599 F.2d 488, 494 (2 Cir.1979), expresses the policy underlying our conclusion:
"[T]he holder in due course is protected not because of his praiseworthy character, but to the end that commercial transactions may be engaged in without elaborate investigation of the process leading up to the contract or instrument and in reliance on the contract rights of one who offers them for sale or to secure a loan. Gilmore, The Commercial Doctrine of Good Faith Purchase, 63 Yale L.J. 1057 (1954);"
Finally, the trial court found that the Bank had failed to present any credible evidence as to the balance of the collateral note when it was introduced in evidence.
However, there is evidence in the record, testimony by Mitchell, a certified public accountant, that the financial statements prepared in the change over audit showed the balance due on the note to be $74,057 as of January 16, 1978. The Association now contends that is not competent evidence to prove the balance due for purposes of this suit. However, aside from that procedural point, we note there is evidence adduced by both sides that payments were made so that credits are due on the original face amount of the note.
The Association's brief states:
"Both parties readily admitted that the face amount of the note was not the amount outstanding on January 16, 1978, as there had been repayments. The accounts agreed as to the amount of repayments from the issuance of the note to January 16, 1978. The probative issue then was the original principal balance of the Association Note. Here the two accountabts disagreed and the court chose to accept the testimony of the Association's accountant, J. Alexander Trieste." (Emphasis added.)
On this point the Bank's reply brief states:
"There is no debate as to the amount of repayments. All parties agree that, if the note is negotiable, the balance on the promissory note as of January 18, 1978, is $74,057.00... . Accordingly, if the note is negotiable and Barnett is a holder in due course, Barnett is entitled to a judgment against the association in the amount of $75,057.00 [sic] plus accrued interest from January 18, 1978."
The Association's reference to the original amount of the note is somewhat mystifying since the note speaks for itself and all the proof is that the original principal amount thereof was $148,860.90. The payments made by the Association reduced that amount to $74,057, and that is the amount the trial judge used in his final judgment of August 20, 1982, before deducting the allegedly improper charges the Partnership made against the Association. We express no opinion as to the trial court's finding concerning the deductions from the principal amount of the note, because that question is not before us.
Accordingly, the judgment is reversed and the cause is remanded with directions to enter judgment for the Bank in the amount of $74,057, together with interest from January 16, 1978.
REVERSED AND REMANDED, with directions.
LETTS and HERSEY, JJ., concur.