885 So.2d 884 (2004)
DAIWA PRODUCTS, INC., Appellant,
v.
NATIONSBANK, N.A., and United Mizrahi Bank, Ltd., Appellees.
No. 4D03-2190.
District Court of Appeal of Florida, Fourth District.
September 1, 2004.
Rehearing Denied November 23, 2004.
*885 Jane Kreusler-Walsh and Rebecca Mercier-Vargas of Jane Kreusler-Walsh, P.A., West Palm Beach, and Paul A. Shelowitz of Akerman Senterfitt, Miami, for appellant.
Mark D. Bohm and Douglas E. Horelick of Thornton, Davis & Fein, P.A., Miami, for appellees.
GROSS, J.
Daiwa Products, Inc. appeals an order dissolving a temporary injunction and directing an issuing bank to pay a draft drawn on a letter of credit. We affirm the trial court's order. On the cross-appeal we remand for the assessment of interest against the injunction bond.
Daiwa imports health care products and distributes them to retailers, such as drug stores, in the United States. SAAT is an Israeli company which manufactures and distributes ear thermometers.
In September 1998, Daiwa entered into an agreement with SAAT to purchase a large quantity of ear thermometers for $229,665.60. To pay for the thermometers, Daiwa secured the issuance of a letter of credit from NationsBank that named SAAT as the beneficiary. The letter of credit specified the type of documentation that SAAT was required to present in order to be paid.
United Mizrahi Bank, which had an existing banking relationship with SAAT, acted as the advising bank on the letter of credit. An advising bank is a bank "which gives notification of the issuance of a [letter of] credit by another bank." § 675.103(1)(e), Fla. Stat. (1997).[1] An advising bank does not incur an obligation to honor drafts drawn under a letter of credit, but it does "assume obligation for the accuracy of its own statement [s]" made to the beneficiary. § 675.107(1), Fla. Stat. (1997).
*886 The sales agreement required SAAT to ship the goods by March 31, 1999. On March, 30, 1999, SAAT provided United Mizrahi with documents conforming to the requirements of the letter of credit; these documents confirmed that SAAT had shipped the goods to Daiwa on March 26, 1999. At the same time, SAAT delivered to United Mizrahi a draft drawn on the line of credit in the amount of $229,665.60. The draft was given to United Mizrahi to pay on an unrelated loan the bank had made to SAAT.
Although on their face the documents conformed to the requirements of the letter of credit, they were fraudulent. SAAT's fraud is beyond dispute. SAAT had not shipped the thermometers as the documents claimed. Daiwa never received any ear thermometers from SAAT.
On April 1, 1999, United Mizrahi presented the conforming documents to NationsBank, along with the $229,665.60 draft. On April 8, 1999 Daiwa obtained a temporary injunction from the circuit court prohibiting NationsBank from releasing the funds. See § 675.114(2)(b), Fla. Stat. (1997) (providing that "a court of appropriate jurisdiction may enjoin" the honoring of a "draft or demand for payment" under the letter of credit). The court required that Daiwa post a $50,000 bond with the clerk of the court. On July 1, 1999, United Mizrahi intervened in the circuit court action and sought dissolution of the temporary injunction. The dissolution issue was tried in March 2003.
As framed in the circuit court and this appeal, the primary issue is whether United Mizrahi was a holder in due course of the $229,665.60 draft. If United Mizrahi was a holder in due course, then it was entitled to payment under section 675.114(2)(a), Florida Statutes (1997), which provides, in pertinent part:
(2) Unless otherwise agreed when documents appear on their face to comply with the terms of a credit but a required document... is forged or fraudulent or there is fraud in the transaction:
(a) The issuer must honor the draft or demand for payment if honor is demanded by a negotiating bank or other holder of the draft or demand which has taken the draft or demand under the [letter of] credit[2] and under circumstances which would make it a holder in due course (s.673.3021)....
After the non-jury trial, the circuit court determined that United Mizrahi was a holder in due course.[3] The court dissolved the temporary injunction and ordered NationsBank to make payment of $229,665.60 on the draft.
Daiwa challenges the trial court's ruling that United Mizrahi was a holder in due course. Because United Mizrahi prevailed on this issue at the evidentiary hearing on the motion to dissolve, we view the evidence in the light most favorable to it. See McPherson v. Phillips, 877 So.2d 755 (Fla. 4th DCA 2004) (on rehearing) ("In reviewing the trial court's ruling, we are required to view the evidence taken at the hearing in the light most favorable to upholding the ruling."); White v. Metro. Dade County, 563 So.2d 117, 134 (Fla. 3d DCA 1990) (noting that the evidence adduced during a temporary injunction hearing *887 would be viewed on appeal in the light most favorable to the prevailing party).
From 1997-1999, SAAT financed the assembly of thermometers through loans from United Mizrahi, with the buyers' letters of credit forming the collateral for the loans. Typically, once SAAT received a purchase order and letter of credit, United Mizrahi advanced 40% of the purchase price to begin the manufacturing process; thirty days before the anticipated delivery date, United Mizrahi advanced 30% of the purchase price; when SAAT presented the documentation required by the letter of credit, the bank advanced the remaining 30% of the purchase price. In these letter of credit transactions, United Mizrahi acted as both a creditor of SAAT and an advising bank. Daiwa's banking expert testified that there was nothing inappropriate or unusual about a bank serving in such a dual role.
Throughout United Mizrahi's banking relationship with SAAT, the company's liabilities always exceeded its assets. Nevertheless, prior to the transaction here at issue, SAAT successfully completed twenty-six letter of credit transactions through United Mizrahi, always fulfilling its manufacturing and shipping obligations. The twenty-six transactions involved over $12 million in merchandise. In none of the transactions had SAAT been accused of fraud.
During the banking relationship, United Mizrahi reviewed SAAT's annual financial statements and met periodically with its executives. Between March 1997 and March 1999, United Mizrahi representatives visited SAAT's plant eight times.
In late February or early March 1999, Morton Nyman, Daiwa's principal, learned from a personal friend that SAAT had canceled its order for plastic cases, a necessary component of ear thermometers. On March 9, 1999, twenty-two days before the shipping deadline, Daiwa requested an amendment to the letter of credit, asking for an increase in the order quantity and letter of credit amount, and seeking an inspection certificate to be added to the list of documents necessary to receive payment. On March 11, SAAT rejected the proposed amendments. On March 16, Daiwa requested a second amendment, this time only asking that a certificate of inspection be added to the list of documentation required for payment. On March 18, SAAT rejected the second request.
Although Daiwa's banking expert testified that SAAT's rejection of the inspection certificate amendments should have raised a "red flag," United Mizrahi's expert disagreed. He testified that the rejection of the amendments could have occurred for other reasons, such as to avoid additional cost or inconvenience so close to the shipment date.
United Mizrahi's loan department never received Daiwa's certificate of inspection amendment requests. Rather, the bank's letter of credit department received the requests and forwarded them directly to SAAT for response. The bank's credit manager reasoned that technical amendments, such as certificates of inspection, were issues for the buyer and seller, not the bank, a position supported by an expert witness in banking practices.
In October or November 1998, United Mizrahi's senior lending officer issued memoranda to staff expressing concerns about SAAT's ability to continue to manufacture and ship products. The bank's testimony at trial downplayed the significance of the memoranda as being a character flaw of that lending officer, who was something of a worrywart. After the memoranda were issued, SAAT successfully completed several orders involving $471,000 in product.
*888 On March, 14, 1999, United Mizrahi's senior lending credit committee denied SAAT's request for renewal of its $1.5 million line of credit and asked SAAT to develop a plan to reduce borrowing. The bank did not immediately call for payment of its outstanding loans or declare any loans in default. Prior to March 14, the bank had approved all of SAAT's previous loan requests, including one made on March 11, 1999. The bank's March 14 decision was a business decision not to continue its relationship with a company that was struggling to be profitable. It had no connection to the company's ability to fill the March 30 order for Daiwa.
As part if its ongoing relationship with the company, an employee of United Mizrahi visited SAAT's operational facility on March 16, 1999. The facility appeared to be fully functional. Workers were on the production line. Thousands of finished thermometers were ready for shipment. Employees in the quality control department were conducting tests on the thermometers. Electronic components for making thermometers were kept in a storage area. SAAT's general manager and employees were on-site and working. From his observations, the bank's employee concluded that SAAT's plant was "fully functional" on March 16, 1999.
Section 675.114(2)(a) adopts the definition of "holder in due course" contained at section 673.3021, Florida Statutes (1997). Under that section, a "holder in due course" is a "holder who takes an instrument without `apparent evidence of forgery or alteration' for value, in good faith, and without notice of certain claims and defenses." Any Kind Checks Cashed, Inc. v. Talcott, 830 So.2d 160, 164 (Fla. 4th DCA 2002) (quoting § 673.3021(1), Fla. Stat. (2001)).
In this case, the issue boiled down to whether United Mizrahi accepted the draft on March 30 and presented it to NationsBank on April 1 in "good faith" within the meaning of section 673.3021(1)(b)2. Section 673.1031(1)(d), Florida Statutes (1997) defines "good faith" as meaning "honesty in fact and the observance of reasonable commercial standards of fair dealing." The legislature amended the definition of "good faith" in 1992. See Ch. 92-82, § 2, at 759, Laws of Fla. As we wrote in Any Kind Checks:
To the old, subjective good faith, "honesty in fact" standard, the legislature added an objective componentthe "pure heart of the holder must now be accompanied by reasoning that assures conduct comporting with reasonable commercial standards of fair dealing." Maine Family Fed. Credit Union v. Sun Life Assurance Co. of Canada, 727 A.2d 335, 342 (Me.1999). No longer may a holder of an instrument act with "a pure heart and an empty head and still obtain holder in due course status." Id.

830 So.2d at 165.
In Any Kind Checks, to apply the law requiring "good faith" under section 673.3021(1)(b)2., we adopted the following analysis by the Maine Supreme Court:
The factfinder must ... determine, first, whether the conduct of the holder comported with industry or "commercial" standards applicable to the transaction and, second, whether those standards were reasonable standards intended to result in fair dealing. Each of those determinations must be made in the context of the specific transaction at hand. If the fact finder's conclusion on each point is "yes," the holder will be determined to have acted in good faith even if, in the individual transaction at issue, the result appears unreasonable. Thus a holder may be accorded holder in due course status where it acts pursuant to *889 those reasonable commercial standards of fair dealingeven if it is negligentbut may lose that status, even where it complies with commercial standards, if those standards are not reasonably related to achieving fair dealing.
830 So.2d at 165-66 (quoting Maine Family, 727 A.2d at 343).
To place this case in context, it is important to understand the structure of a letter of credit transaction. Daiwa was the "customer," the "buyer ... who cause[d] an issuer to issue" a letter of credit. § 675.103(1)(g), Fla. Stat. (1997). NationsBank was the "issuer" that issued the letter of credit. § 675.103(1)(c). SAAT, the seller of the goods, was the "beneficiary" of the letter of credit which "was entitled under its terms to draw or demand payment." § 675.103(1)(d).
Three different agreements are present in the typical letter of credit transaction: (1) the contract for sale of goods between the buyer and the seller; (2) the creation of the letter of credit between the buyer (customer) and the issuer (bank), which requires the customer to reimburse the issuer for payments made on the letter of credit; and (3) the letter of credit which is an undertaking by the bank to pay the seller (beneficiary) upon the presentation of certain documents.
Significantly, the bank's undertaking to the beneficiary "is independent of, and unrelated to, the underlying contract between the beneficiary and the applicant that purchased the letter of credit." Banco Lavra, S.A. v. Cargil Int'l, 732 So.2d 1086, 1088 (Fla. 3d DCA 1998). Under this "independence principle," the "issuer must pay on a proper demand from the beneficiary even though the beneficiary may have breached the underlying contract with the applicant." James J. White & Robert S. Summers, Uniform Commercial Code § 26-2 (4th ed.1995).
Letters of credit originated in international trade as a means to orchestrate payments in sales transactions. See id. § 26-1, 26-2. From the seller's standpoint, letters of credit are a desirable device because they substitute a solvent, stable issuer, normally a bank, for the buyer. Once the seller presents documents required under the letter of credit to the issuer, the seller gets paid. White and Summers describe the benefits of a letter of credit transaction from the seller's standpoint:
[D]rafts drawn by a seller on an issuing bank are far more certain of payment than drafts drawn on an ordinary buyer who is committed to pay under the terms of an ordinary sales contract. The burden of pursuing litigation is also transferred to the buyer since the seller will have money in hand. In effect, the seller has bargained for the right to be the defendant instead of the plaintiff in litigation on the underlying contract. The buyer will bear the burden of litigating, often in a foreign jurisdiction, to recover under the contract.
After paying beneficiary's draft, the issuing bank has the documents which control the goods. These secure the issuing bank's right to get reimbursed by the applicant buyer upon payment to the beneficiary seller under the letter of credit.
Id. § 26-1a. (footnote omitted).
In this case, competent substantial evidence supported the trial court's conclusion that United Mizrahi was a holder in due course of the draft presented to NationsBank.
United Mizrahi presented evidence that, as a creditor bank, it had comported with reasonable banking standards which were reasonably related to achieving fair dealing. There was no evidence that United *890 Mizrahi knew that SAAT had fraudulently prepared the documents required under the letter of credit. In spite of its tiptoeing at the edge of solvency, SAAT had successfully completed twenty-six letter of credit sales transactions during its relationship with United Mizrahi. Two weeks before the scheduled delivery date, a bank employee visited SAAT and observed a fully functioning manufacturing facility. The bank viewed Daiwa's request for amendments to the letter of credit as matters properly left to the buyer and seller. As the trial court implicitly held, it was not the bank's duty as a creditor to police the sales transaction between SAAT and Daiwa.
Many of Daiwa's arguments are quibbles with the weight of the evidence. For example, Daiwa argues that United Mizrahi violated reasonable banking standards by failing to generate a protocol and committee meeting minutes when denying SAAT's request to renew its credit line on March 14, 1999. Whether the absence of the protocol at trial was the smoking gun that Daiwa claimed was a matter for the trial judge, who accepted the testimony of United Mizrahi's witnesses about what the bank knew and when the bank knew it.
This case is unlike those cases where holder in due course status is denied because of direct evidence that the holder of a draft had actual knowledge of fraud in either documentation required by a letter of credit or the underlying transaction.
For example, in Andina Coffee, Inc. v. National Westminster Bank USA, 160 A.D.2d 104, 560 N.Y.S.2d 1 (N.Y.App.Div.1990), the creditor bank advanced $2,100,000 to a seller of coffee. The seller's check to repay the loan bounced, and the creditor bank "was left with an unpaid $2,100,000 loan." Id. at 2. A few weeks later, the bank received a letter of credit in the amount of $2,104,000. Six weeks before the earliest possible date for presentment under the letter of credit, the bank accepted from the seller its draft and post-dated documents, including bills of lading dated six weeks in the future for goods that had not been shipped. After the issuer refused to pay the draft because of discrepancies in the documents, the creditor bank had the seller "alter[ ] and realter[ ]" the dates on the bills of lading in a way that made it appear "that the documents were designed more to effect payment under the letters of credit than to reflect accurately the business transactions that they were intended to evince." Id.
The appellate court reversed a summary judgment in favor of the creditor bank. The court observed that the post-dating of the bills of lading was "a form of fraudulent practice." Id. at 4. Equally significant was the creditor bank's "apparently active role in obtaining the revisions of the documents, particularly after it was confronted with definite proof of [the seller's] financial instability in the form of a bad check." Id. at 5. Such conduct precluded a summary judgment for the creditor bank on the holder in due course issue, since it raised "questions of fact as to whether it was acting in good faith and without actual knowledge of the exporter's fraud." Id.; cf. Barclay Knitwear Co. v. King'swear Enters., Ltd., 141 A.D.2d 241, 533 N.Y.S.2d 724, 729 (N.Y.App.Div.1988) (holding that a creditor bank of an assignee of a letter of credit was entitled to holder in due course where there was no "direct evidence that it had notice of the alleged fraud" by the beneficiary of the letter of credit).
Brenntag International Chemicals, Inc. v. Norddeutsche Landesbank GZ, 70 F.Supp.2d 399 (S.D.N.Y.1999), is a case where a creditor bank of the beneficiary of a letter of credit accepted an undated default letter from the beneficiary and paid $2.4 million for a letter of credit, the default *891 letter, and certain false papers. When the letter of credit came due, the creditor bank "stamped an appropriate date on the default letter and presented it along with other documentation" to the issuer for payment. Id. at 401. The court denied the creditor bank holder in due course status, because the creditor bank "knew that the undated [d]efault [l]etter could not have reflected the actual condition it purported to certify." Id. at 408.
Unlike the situations in Brenntag and Andina Coffee, the trial court did not find that United Mizrahi either had knowledge of SAAT's wrongdoing at the time it accepted the draft in this case or participated in a manipulation of documents in order to get paid under a letter of credit.
On the cross-appeal, we agree that the trial court erred when it failed to award prejudgment interest.
Daiwa obtained the preliminary injunction authorized by section 675.114(2). To be entitled to a preliminary injunction under that section, a movant must still meet the requirements of Florida law. See White & Summers, supra, §§ 26-10. Florida Rule of Civil Procedure 1.610(b) requires that a bond be posted for a temporary injunction to issue. Here the trial court set a $50,000 bond. "When a court sets an injunction bond, the amount should reflect the court's determination of the foreseeable damages for a wrongful injunction." Advantage Digital Sys., Inc. v. Digital Imaging Servs., Inc., 870 So.2d 111, 116 (Fla. 2d DCA 2003). Also, a court may increase or decrease an injunction bond if its initial estimation of damages appears to be incorrect. When a preliminary injunction under section 675.114(2) prevents payment under a letter of credit, the most foreseeable damage is the loss of use of the money withheld, which is measured by prejudgment interest.
A party against whom an injunction has been wrongfully issued is entitled to damages caused by the injunction. E.g., § 60.07, Fla. Stat. (1999) (providing that on dissolution of an injunction, "the court may hear evidence and assess damages to which a defendant may be entitled under any injunction bond"); Jefferies & Co. v. Int'l Assets Holding Corp., 830 So.2d 256, 259 (Fla. 5th DCA 2002). "The standard for determining whether an injunction was wrongfully issued is simply whether the petitioning party was unentitled to injunctive relief." Parker Tampa Two, Inc. v. Somerset Dev. Corp., 544 So.2d 1018, 1021-22 (Fla.1989).
The trial court's decision that United Mizrah was a holder in due course and the resulting dissolution of the injunction "constitutes an adjudication that [the injunction] was wrongfully issued." Jefferies & Co., 830 So.2d at 259. United Mizrah was therefore entitled to an award of interest against the injunction bond that compensates it for the delay in payment caused by the issuance of the preliminary injunction. See Parker Tampa, 544 So.2d at 1021-22. As the supreme court held in Parker Tampa, damages caused by a wrongfully issued injunction are limited to the amount of the injunction bond. Id.
Cromwell v. Commerce & Energy Bank of Lafayette, 528 So.2d 759 (La.Ct.App.1988), provides an example of an award of prejudgment interest for the wrongful issuance of a section 675.114(2) injunction. In that case, the trial court granted injunctions to stop issuing banks from honoring drafts drawn on letters of credit. Id. at 760. The injunctions were issued under the Louisiana Revised Statutes Annotated, Title 10, section 5-114, which is identical to section 675.114. See Cromwell v. Commerce & Energy Bank of Lafayette, 450 So.2d 1, 6 (La.Ct.App.1984). An appellate court reversed the granting of the preliminary *892 injunctions and remanded the case for "consideration of whether damages and attorney's fees should be awarded, and if so, the amount." Cromwell, 528 So.2d at 761.
On remand, the trial court awarded damages of $1,151,194. The award was based on the delay in payment caused by "the improvident issuance of the preliminary injunctions." Id. at 762. The appellate court affirmed this damage award. Id.
We affirm the order dissolving the temporary injunction. We reverse the denial of prejudgment interest and remand for an assessment of interest set against the bond amount. See Parker Tampa, 544 So.2d at 1021.
FARMER, C.J., and MAY, J., concur.
NOTES
[1] The parties agree that this case is covered by Article 5 of the Uniform Commercial Code, Chapter 675, Florida Statutes (1997). The 1999 amendments to Chapter 675 do not apply, because this case involves a letter of credit issued before July 1, 1999. See § 675.118(1), Fla. Stat. (2003).
[2] The definitions section of Article 5, section 675.103(1)(a), Florida Statutes (1997), treats "credit" and "letter of credit" as synonyms.
[3] The court wrote, "[b]ased upon the evidence, lack of evidence, conflict in the evidence and the credibility and believability of witnesses, the Court finds that the intervenor, United Mizrahi Bank is a holder in due course of the subject draft."