# Third District Court of Appeal

## State of Florida

Opinion filed January 25, 2017.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D15-1376
Lower Tribunal No. 12-22445
_____

**Banco Bilbao Vizcaya Argentaria,**
Appellant,

vs.

**Easy Luck Co., Inc.,**
Appellee.

An Appeal from the Circuit Court for Miami-Dade County, Gill S. Freeman, Judge.

Post & Romero and Robert G. Post, for appellant.

Dick Lee & Associates, P.A., and Alan H. Ramer, for appellee.

Before SUAREZ, C.J., and SALTER, J., and SHEPHERD, Senior Judge.

SHEPHERD, Senior Judge.

Banco Bilbao Vizcaya Argentaria (BBVA) appeals a final judgment in favor of Easy Luck Co., Inc., on BBVA's action against Easy Luck to recoup the sum of $85,000, mistakenly paid by BBVA at its office in the Dominican Republic by draft on an account of a customer there and credited to Easy Luck's account at SunTrust Bank in Miami-Dade County. Applying sections 3-303 and 3-418 of the Uniform Commercial Code, §§ 673.3031 and 673.4181, Fla. Stat. (2012), the trial court held that BBVA should suffer the full amount of the loss. We agree and affirm the judgment of the trial court.

## FACTUAL AND PROCEDURAL BACKGROUND

This lawsuit arises out of a transaction for the sale of shoes by Easy Luck, a Florida company, to JAMS Technologies, Inc., a distributor located in the Dominican Republic. JAMS desired to purchase $43,337 worth of shoes from Easy Luck. At the time of the transaction, JAMS had an outstanding debt owed to Easy Luck in the amount of $77,000. Easy Luck told JAMS that it would ship the shoes to JAMS only if it received payment in advance. Because JAMS did not have a bank account in the Dominican Republic that transacted business in dollars and for local tax reasons, JAMS principal, Alex Molina, arranged through three individuals who represented themselves as principals and employees of a large paint company, Lanco Manufacturing Corp., and with whom Molina had done some business in the recent past, to issue a draft payable to Easy Luck in the

2

amount of $85,000, purportedly drawn on Lanco Manufacturing's BBVA bank account. Anxious to expedite delivery of the shoe order to his company in the Dominican Republic, Molina carried the draft to Miami and delivered it personally to Easy Luck's President, Alan Wu. Molina told Wu to apply the remaining monies in excess of $43,337 to the unpaid debt owed by JAMS to Easy Luck.

Upon receiving the draft, Wu went to a local BBVA business office to ascertain the status of the account on which the draft was drawn and try to arrange quick payment so he could ship the shoes.[1] The local BBVA business office declined to provide any information regarding either the account or the draft. Wu then deposited the draft for collection with his bank, SunTrust Bank, which advised him it would take several weeks for the draft to be collected and Easy Luck's account credited. Wu advised Molina of the expected delay in the shipment.

BBVA paid the draft against Lanco Manufacturing's account at BBVA's office in the Dominican Republic on January 27, 2012. The funds were credited and made available to Easy Luck in its account at SunTrust Bank in Miami on February 6, 2012. Upon learning the funds were credited and available in Easy Luck's account at SunTrust Bank, Wu noted JAMS delinquent balance "paid" on

---

[1] Bowing to the pressure from Molina, Wu actually shipped a small part of the order in the amount of $7,783 before the $85,000 was credited to his account at SunTrust.

3

the books of his company in the amount of $41,663, the sum remaining on the $85,000 draft after subtracting the price of the shoe order, confirmed the items to complete the shoe order and shipped them to JAMS in the Dominican Republic on February 27, 2012.

On February 7, 2012, the day after Easy Luck's account was credited with the full amount of the draft, a Lanco Manufacturing employee contacted BBVA claiming the draft was invalid. It was quickly determined that the instrument was a counterfeit and a forgery. Recognizing that it paid the instrument by mistake, BBVA credited Lanco Manufacturing's account in the sum of $85,000 and, on February 9, 2012, advised SunTrust of the counterfeiting and forgery of the instrument. However, no one advised Easy Luck.

On April 27, 2012, BBVA offered SunTrust a hold harmless letter and demanded that SunTrust reverse the credit to Easy Luck's account. One month later, SunTrust advised BBVA that it would not reverse the deposit to Easy Luck's account and that BBVA's client "would need to take [the] issue up with either BBVA for clearing the collection as a good item or directly with [SunTrust's] client who received the credit for the collection."

Thereafter, BBVA filed a one-count complaint against Easy Luck to recover the $85,000 loss it had suffered by payment of the draft. The complaint was

served on Easy Luck on June 14, 2012. This was the first time Easy Luck had any knowledge of the counterfeiting and forgery.

## ANALYSIS

Resolution of this dispute is governed in the main by Florida's version of the Uniform Commercial Code, section 673.4181, titled "Payment or acceptance by mistake," which provides as follows:

(1) **Except as provided in subsection (3), if the drawee of a draft pays** or accepts **the draft** and the drawee acted **on the mistaken belief** that payment of the draft had not been stopped pursuant to s. 674.403 or **that the signature of the drawer of the draft was authorized, the drawee may recover the amount of the draft from the person to whom or for whose benefit payment was made** or, in the case of acceptance, may revoke the acceptance. **Rights of the drawee under this subsection are not affected by failure of the drawee to exercise ordinary care in paying or accepting the draft.**

(2) Except as provided in subsection (3), if an instrument has been paid or accepted by mistake and the case is not covered by subsection (1), the person paying or accepting may, to the extent permitted by the law governing mistake and restitution, recover the payment from the person to whom or for whose benefit payment was made or, in the case of acceptance, may revoke the acceptance.

(3) **The remedies provided by subsection (1)** or subsection (2) **may not be asserted against a person who took the instrument in good faith and for value or who in good faith changed position in reliance on the payment** or acceptance. This subsection does not limit remedies provided by s. 673.4171 or s. 674.407….

(Emphasis added.) The thrust of the statute is to provide that as between two innocent victims of a scalawag who perpetrates a fraud on a drawee bank, the bank can recoup the amount mistakenly paid, even if the bank was negligent in making the payment, unless the person who received the funds can prove that it either (1)

5

"took the instrument in good faith and for value," or (2) "in good faith changed position in reliance on the payment . . . ." Id. In this case, the recipient of the funds, Easy Luck, asserts the first exception in defense of having to return to BBVA the $41,663 Easy Luck applied to partial payment of the $77,000 delinquent debt owed it by JAMS, and the second exception in defense of repayment of the $43,337 it credited itself for the cost of the shoes. We agree with Easy Luck on both points.

As to the $43,337 payment, BBVA concedes that Easy Luck "changed position in reliance" on BBVA's mistaken payment of the draft within the meaning of the second exception to section 673.4181(3) when it shipped the shoe order to JAMS in the Dominican Republic and therefore is not entitled to recoup that portion of the mistakenly paid draft. However, BBVA argues that Easy Luck did not take the draft "in good faith and for value" within the meaning of the first exception to section 673.4181(3) for the remaining $41,663, the amount which was credited against the delinquent debt JAMS owed to Easy Luck. We disagree.

BBVA's main argument on this point is that Easy Luck did not "give value' for the amount of the draft remaining after paying for the shoe shipment within the meaning of the first exception because all it did was make a "bookkeeping entry," reducing the amount of the delinquent debt on its books, and should now just erase

6

the "bookkeeping entry," a kind of "no harm, no foul" type of argument.  The

argument has some appeal.   However, the Uniform Commercial Code, as adopted

in this state, allocates the loss between innocent parties in these circumstance

differently.

Section 673.3031, Fla. Stat. (2012), section 3-303 of the Uniform

Commercial Code provides that

> **(1) An instrument is** issued or **transferred for value if**:
>
> (a) The instrument is issued or transferred for a promise of
> performance, to the extent the promise has been performed;
> (b) The transferee acquires a security interest or other lien in the
> instrument other than a lien obtained by judicial proceeding;
> **(c) The instrument is** issued or **transferred as payment of**, or as
> security for, **an antecedent claim against any person, whether or
> not the claim is due.**
> (d) The instrument is issued or transferred in exchange for a
> negotiable instrument; or
> (e) The instrument is issued or transferred in exchange for the
> incurring of an irrevocable obligation to a third party by the person
> taking the instrument.
>
> (2) The term "consideration" means any consideration sufficient to
> support a simple contract. The drawer or maker of an instrument has a
> defense if the instrument is issued without consideration. If an
> instrument is issued for a promise of performance, the issuer has a
> defense to the extent performance of the promise is due and the
> promise has not been performed. If an instrument is issued for value
> as stated in subsection (1), the instrument is also issued for
> consideration.

(Emphasis added.)   The purpose of section 673.3031(1)(c) is explained in

Comment 4 to the Uniform Commercial Code as follows:

7

**Subsection [1][c] follows former Section 3-303(b) in providing that the holder takes for value if the instrument is taken in payment of** or as security for **an antecedent claim, even though there is no extension of time or other concession, and whether or not the claim is due. Subsection [c] applies to any claim against any person;** there is no requirement that the claim arise out of contract. **In particular the provision is intended to apply to an instrument given in payment of or as security for the debt of a third person, even though no concession is made in return.**

Section 673.3031 describes the very situation at issue here. It is undisputed on the record of this case that when Molina delivered the $85,000 draft to Wu, Molina told Wu to apply any sums remaining after payment of the shoe shipment to JAMS' delinquent account with Easy Luck. The plain language of the statute informs that the $77,000 delinquent debt owed by JAMS to Easy Luck was an "antecedent debt." Case law supports our plain reading. See, e.g., Turney v. Seale, 473 So. 2d 855, 857 (La. Ct. App. 1985) (involving a delivery or transfer of promissory note in payment of antecedent claim of past-due alimony); Barbour v. Handlos Real Estate & Bldg. Corp., 393 N.W.2d 581, 589 (Mich. Ct. App. 1986) (holding assignment made in full payment of prior loan constituted an assignment in payment of an antecedent claim). It would be so even if Easy Luck had not engaged in the formality of making the "bookkeeping entry" before the controversy arose. See, e.g., S. Bank of Commerce v. Union Planters Nat. Bank, 289 S.W.3d 414, 416 (Ark. 2008) (determining bank gave value for check where it

8

accepted cashier's check for payment of mortgage, an antecedent claim, even though it took no immediate action on the mortgage).

BBVA finally argues that Easy Luck did not take the draft "in good faith," as also required by the first exception to section 673.4181(3). BBVA apparently forgets the second exception to section 673.4181(3), to which it acceded on the $43,337 shoe purchase credit, also contains a "good faith" requirement. When BBVA conceded it should suffer the loss in the amount of the shoe purchase, it seems that BBVA must necessarily have conceded Easy Luck "in good faith" under that exception as well. See § 673.4181(3). BBVA ignores this apparent inconsistency in its argument.

However, we need not rely on a technical or procedural argument on this point. We find that there is competent substantial evidence in the evidence adduced at trial to support the trial court's conclusion on the merits that Easy Luck took the draft "in good faith."

Section 3-103 of the Uniform Commercial Code, adopted in Florida as section 673.1031 of the Florida Statutes, defines "good "faith" as "honesty in fact and the observance of reasonable commercial standards of fair dealing." Under this provision:

> The factfinder must ... determine, first, whether the conduct of the holder comported with industry or "commercial" standards applicable to the transaction and, second, whether those standards were reasonable standards intended to result in fair dealing. Each of those

> determinations must be made in the context of the specific transaction at hand. If the fact finder's conclusion on each point is "yes," the holder will be determined to have acted in good faith even if, in the individual transaction at issue, the result appears unreasonable. Thus a holder may be accorded holder in due course status where it acts pursuant to those reasonable commercial standards of fair dealing— even if it is negligent—but may lose that status, even where it complies with commercial standards, if those standards are not reasonably related to achieving fair dealing.

Any Kind Checks Cashed, Inc. v. Talcott, 830 So. 2d 160, 165-66 (Fla. 4th DCA 2002) (quoting Maine Family Fed. Credit Union v. Sun Life Assurance Co. of Canada, 727 A.2d 335, 343 (Me. 1999)).

Comment 4 to the definitions, appearing in Article 3 of both the Uniform Commercial Code and as it exists in this state, provides some further assistance in our analysis:

> Although fair dealing is a broad term that must be defined in context, it is clear that it is concerned with the fairness of conduct rather than the care with which an act is performed. Failure to exercise ordinary care in conducting a transaction is an entirely different concept than failure to deal fairly in conducting the transaction.

§ 673.1031. In this case, Easy Luck did take precautionary measures upon delivery of the draft by Molina to Easy Luck's office in Miami. First, Wu inquired of the local BBVA office about the funds prior to depositing the draft. Second, Easy Luck resisted pressure by Molina to send the shoe shipment before the draft cleared and the funds were available in Easy Luck's account. Lastly, Easy Luck had no actual knowledge the check was forged until it was served with the

complaint in this case. In retrospect, one could always do more. However, the standard of "fairness" by which Easy Luck's actions are to be judged is not a negligence standard. Rather, we are told that the standard of "fairness" to be applied in cases such as this "should be measured by taking a global view of the underlying transaction and all of its participants." Talcott, 830 So. 2d at 165. We believe these facts are sufficient to support the finding of the trial court that Easy Luck acted in good faith.

Finding no error in either the findings of fact or the conclusions of law made by the trial court in this case, we affirm the judgement.

Affirmed.